The first of them is number 25-1870 Jet Elad, I guess it's called, pronounced versus NCAA. Is it Mr. Kilaru, is that how you pronounce it? Yes, Your Honor. Take a moment and whenever you're ready, let us know. Thank you. Good morning, Your Honors. And if I could, I'd like to reserve three minutes for a moment. Granted. In Smith, this court held that the Sherman Act does not apply to the NCAA's promulgation of eligibility requirements. In the decision on appeal, the district court concluded that it could wait and see whether Smith applies based on further guidance from this court. A whole lot's changed in the 27 years since Smith was decided, hasn't it? I think factually that's true, Your Honor, but the question is whether those changes are legally relevant to the analysis under the Sherman Act. How could the entrance of the NIL not change those considerations in a relevant way? Your Honor, I don't think it does because at the end of the day, the question under the Sherman Act is whether or not the rule that's being challenged is a commercial rule that's affecting the terms of a commercial transaction. And our position is, first of all, that it's not because these rules are simply defining who gets to participate in college sports and not regulating the term of any specific commercial transaction. And that distinction flows actually straight from Alston. Because first of all, Alston affirmed the O'Bannon decision from the Ninth Circuit, which expressly adhered to this distinction between compensation rules that say how much student athletes can get paid and eligibility rules that define and delimit who can participate in sports. Alston also recognized in the opinion itself that the antitrust laws encourage businesses to come up with unique product offerings of which college sports is relative to professional sports. And even Justice Kavanaugh's concurrence acknowledged that everyone would agree the NCAA can promulgate rules that require college athletes to be students in good standing. Look, Smith was built on an understanding of amateurism that is clearly superseded by Alston and the economic realities. And Justice Kavanaugh likewise recognized there's a lot of money here and the old rules of no compensation and no name, image and likeness are gone. Right. We have to draw some lines here. Smith adopted a categorical like eligibility is never involved, but eligibility is going to go to the supply in the labor market. Right. So we have to decide which eligibility rules post Smith are economic, which aren't. These are student athletes. Some of these rules go to who's a student like your GPA, etc. But other than those go to their athletes, how many years they can compete, etc. Why shouldn't we understand this rule to be on the athlete side of the line? Your Honor, I think that it's because it goes more to the student side. I think the product that the student NCAA is offering both student athletes and consumers is college athletics, which played by college students. And if you look at the implications of the rules on the other side and the proposals on the other side, it's first of all, to actually subject every eligibility rule to the rule of reason. And it's to then say that court should be in the business of deciding whether it should be four years and five years, which is what the NCAA members, which are educational institutions, have decided. Or for junior college students, six years in a six year period, which is effectively what's been asked for here. And that just begets question after question. That doesn't mean that it's not commercial. That means that courts should be appropriately deferential about what's reasonable here and not overly intrusive or adopting per se rules. Your Honor, I think our first position would be that it is not something the court should get into because the Sherman Act applies only to commercial rules and these rules don't regulate commerce. But they have a real effect on, is it your position that it doesn't matter that they have an effect or they don't have an effect at all? I don't think that can be the only test because it's also true that a GPA rule has an effect on who can participate. OK, so you're not denying there's an effect. You're just saying the effect is not cognizable. I think the effect is not a commercial effect under the meaning of the Sherman Act. And saying that it is a commercial effect under the Sherman Act brings the judiciary into a whole host of line drawing problems about whether the GPA requirement should be 2.3 or 2.5, whether it should be four years and five years or six years and seven years. And this isn't theoretical because just in the eligibility space, what followed the decision below and what followed the decision in PAVIA are lawsuits by students saying that it's not enough to just have four years in Division I, that Division II shouldn't count, that Division III shouldn't count. So inevitably, there's going to have to be... Now that you're going into that territory, what is the relevant market here? Because it's been suggested that there are two, Division I or Division I and JUCO. Which one do we use? So, Your Honor, I think this goes past the commercial issue, but I think it's an important backup issue. There isn't an answer to that in the record because there isn't record evidence as to what the relevant market is. And I think that speaks to the broader problem with the decision below, which is that it applied an approach to preliminary injunctions that's out of step with this court's jurisprudence, including the recent Delaware sportsman case. Is it your position that no market has been identified or there's just not relevant evidence to support the market that was identified? I think I would say both, Your Honor, because first of all, it's not clear from the record in this case which market the plaintiffs are referring to. And by which you mean the general market, the labor market for college football athletes in general, or the specific market, the NCAA Division I football players in particular? That's correct, Your Honor. I think throughout the... If you look through the record in this case, both the preliminary injunction hearing and what the expert put in, the plaintiff's expert put in, there is this kind of waffling back and forth between the broader labor market, the alleged labor market, and then this narrower market for just Division I. And we don't think that's how it should work in an antitrust case. You don't get to name two markets and then kind of pick which market you're using for purposes of different harms. So in identifying the market, there's a problem. But then as a record matter, there's also a severe problem here, too, because we'd urge the court to actually look closely at what the expert said in this case on the market. And I think you can find it at Joint Appendix 121 and 22. There are literally only two pages of the plaintiff's expert report that talk about the relevant market. There is zero economic analysis. There's zero analysis of market conditions, zero data, zero econometrics, zero application of any recognized test of market definition. There's just a statement that Alston seems right to him as an economist. Let me ask you a question. So your friends on the other side argue that your expert, Dr. Flier, I think was the name, accepted the relevant markets that Dr. Maxey proposed. Number one, is that correct? And if it is, I assume you're going to tell me no. But number one, is that correct? If it is correct, if not, number one, is that correct? It is not correct, Your Honor. I think if the record speaks for itself on this question, Dr. Flier was asked a number of questions about the market. And at one point, the judge just kind of jumped in and said, you're not disputing it. Mr. Flier said, Dr. Flier said, correct, wanted to explain. And then the judge said, there's your answer, and moved on. So I don't think you have anything close to the concession the plaintiffs say you have. But also, stepping away from that moment in the courtroom, look at the record more broadly. There is no evidence in this record. There are two pages about what the relevant market is. Those two pages from the expert say, look at Alston. But that actually doesn't work, because one of the things that is clear from Alston, that the Alston Supreme Court says very clearly, is that when market conditions change, you need to reanalyze the market and make a decision based on current market realities. Now, it's our view that Alston did not change the game. But accepting the premise that it did, the plaintiffs can't have it both ways. They can't say Alston defined the relevant market, but the world has changed since Alston, and we don't need to do any analysis of those changes since Alston. Right. And the market definition in Alston is not the same as the market definition of trying to jump lump junior colleges. That's also correct, Your Honor. It's much narrower, actually. The market in Alston was just FBS, which is a narrower subset of Division I football, which is one of the two markets that I think there's sort of a picking and choosing between here, too. And that also then carries over into the issue of anti-competitive harm, because here, too, there isn't any actual evidence in the record of harm to competition versus harm to an individual person. And that is the hallmark of an antitrust violation. You look to harm in the market. This comes from Atlantic Richfield and a number of other Supreme Court precedents. You have to look at the market as a whole. So where is the analysis of evidence in the market? Again, it isn't there. There's about 12 pages this time, a little more of the experts' report that touch on this. I think it's Joe in Appendix 858 to 70. But you don't see any data. You don't see any analysis of NIL values. You don't see any analysis of compensation. And why does this matter? Because when the plaintiffs are saying that there's a harm to competition, what you need to see is some kind of negative effect on price or some kind of negative effect on output. There's, by definition, no output effect here, because the number of people who are going to play in Division I is the same. I think everyone would agree this question is about who gets to be in that group versus not. But then in terms of price, there's no evidence from which the court can make a determination as to whether or not prices have been increased or decreased based on the record here. You would expect to see some kind of study that perhaps says, well, these junior college folks are higher earning folks, or older players earn more money than lower players. And there's any number of analyses I suppose a plaintiff could try to do. But the relevant point in this case is that none of it has been done. And so on two of the most important issues in an antitrust case, the two issues in which the plaintiffs have the burden of proof before you even have to get anything from the defense, you have a small set of paper record that doesn't come close to answering the questions with evidence. And that then I think, I suppose in closing, brings back to the broader point, which is the error in the district court's application of the preliminary injunction standard. Because as this court said in the Delaware sportsman case, the right to relief needs to be clear. And one of the harms of overusing preliminary injunctions is making merits decisions on a hurried basis based on records that are too small to make a decision. And here you have that. I think if you look at the very first question that the judge asked the NCAA in the hearing, it was, look, it seems like courts are going both ways on this. Shouldn't I just grant the PI and then the Third Circuit can sort it out later? And that is just not how we respectfully submit preliminary injunctions are supposed to work. You don't get to balancing of the equities. You don't get to any kind of weighing of the scales until they first show, the plaintiff first shows, a clear entitlement to relief and irreparable harm. And here you didn't have enough. There wasn't enough in the record on a clear entitlement to relief. And so the preliminary injunction should never have been entered in the first place. Essentially, is not what you're saying, that there is not a reasonable likelihood of success on the merits for getting the other three? Because irreparable harm, clearly plaintiff here has showed that he has irreparable harm. The balance may tip in his favor, maybe of public interest, but a gateway issue are the first two. And would you just address success on the merits then? Your Honor, we wouldn't concede necessarily irreparable harm. I think we've laid out our argument on that on the briefs. But taking your stronger argument on success on the merits, as I said, taking the premise of your question, I think likelihood of success is a factor that they have to establish a clear showing on. And that hasn't happened here. Well, it's reasonable likelihood of success. I think that is the way it's traditionally phrased. I do note that in Delaware sportsmen, the court said the right to relief needs to be clear. And maybe that's a clear showing of a likelihood of success on the merits. But either way, we don't— But basically, our case in Riley said the first two are the most important. It doesn't have to be greater than 50%. Irreparable harm, most district judges will tell you, I'm not going to find irreparable harm unless it's greater than 50%. And then you've got the—you can go, if you have a really strong case on one, you may have less that you need on the other. It's sort of a balancing between those first two points. At least that's what Riley says, our decision in 2017. So you're saying here, what I read from your briefs is not only is there not a reasonable likelihood of success, there isn't much likelihood of success at all. I think that's correct, Your Honor. I think we would rely on Delaware sportsmen, which says you look at the likelihood of success on the merits, the risk of irreparable injury. And those are the two, quote, most important factors. And then only if those are present do you get into the balancing. But I think under any understanding, and I know I've gone past time, but just to briefly close out the point, under any understanding of that first factor here, the standard wasn't met. And I think it's critical, particularly in the preliminary injunction context, to evaluate the case based on the record as opposed to based on claims that could have been made. No further questions. Thank you. We'll have you back on rebuttal. Good morning, Your Honors, and may it please the Court. I think we're having a difference of opinion about the applicable standard. So I'll just say your name for the record. Mr. Marino, Kevin Marino, correct? Thank you, Your Honor, and I apologize. Yes, it's Kevin Marino for the Appellee eLab. So I think we're having a dispute about the standard here, so maybe just a moment on that. Your Honor, Judge Ambar, you referred to Riley, and Riley is the operative case on this question. A movement for preliminary equitable relief must meet the threshold of the first two most critical factors. Winning on the merits is showing significantly better than negligible, but not necessarily more likely than not. And critically, this Court has adopted Judge Easterbrook's observation that how strong a claim on the merits is enough depends on the balance of harms. The more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary. But on the reasonable likelihood of success, we need to almost start from the dugout, if you will. What is your market definition? The market definition, and there was evidence in the case, and I was surprised to hear my friend across the table say that there was no evidence of it. There was actually evidence in the case of, first of all, the relevant market being, number one, the market of Division I, NCAA Division I college football, and then, as well, the market, a separate market that includes the broader market of bucos as well. I did not see the expert's report had no graphs, no data, no econometrics. I think Mr. Kallara was right. This did not look like a typical report where there was some measurement of elasticity or something like that. So I think, Your Honor, that particularly at the preliminary injunction stage, where, as this court has observed, the cases go forward very quickly, they go forward on an abbreviated set of facts, there's substantial deference granted to the district court judge who's assessing, but what Dr. Maxey said was quite clearly, as the court found in Alston. Okay, but Alston had a very different market definition. Well, I don't think that's exactly right. Mark, it was a subset of Division I. Your client needs the market to be a whole lot bigger than a subset of Division I. Well, if you expand the market, as Dr. Maxey has, to the entire cohort of Division I football players, there isn't any doubt that that, I mean, it's not a serious question as to whether that market actually exists. I'll grant you that Dr. Maxey expanded it and said those words. Let me ask you this. What did Dr. Maxey tell us about the market structure? Well, what he laid out, and I think laid out fairly clearly, is you have college football being played at the highest level. There's a monopsony held by NCAA. Why is it a monopsony? They're the only buyer for this talent. That's it, right? Okay. And he made that very much an adjunct to his description of the market. And he made that quite clear, that the fact that they are the only buyer for this talent, the only place you can sell it, makes it very clear, I think abundantly clear, that this market exists and that this rule, these eligibility rules as a general matter, but this JUCO rule in particular, is not only preventing folks from entering that market, it's obviously depressing prices within that market, which is classic antitrust. That's a classic restraining order. JUCOs are not players in the market. I beg your pardon? JUCOs are not players in the market. Junior colleges are not. JUCOs are playing a large market, but JUCOs are, and Mr. Elad's experience makes this very clear. He is not a person who went directly to a JUCO from high school. He was a Division I player who wasn't ready. They treat somewhat uncharitably and I think inaccurately his testimony on the subject as to what happened to him at Ohio University. He was very clear he wasn't ready to be a college player. He needed to be elsewhere. He entered the transfer portal to try to go to another Division I school and got zero offers. That's when he went to a JUCO. You know, when you said that this is obviously depressing prices in this market, when I hear a lawyer use obviously or clearly, I reach for my red pen. It's a substitute for evidence or analysis. Okay? I didn't see the evidence. Moreover, basic market theory says larger labor supply, lower price. Your theory is smaller labor supply, lower price. It would take a lot of evidence and analysis to convince us of something counterintuitive. What goes beyond obviously or clearly other L.Y. adverbs to tell us that this is backed by data and analysis? That the fact that this NIL money is not equally distributed throughout the players. That's not how it works. Their argument is this isn't really anti-competitive because, you know, you have players that are being kept out, presumably the more experienced older players, right? They're being kept out, the JUCO players. Forget about the fact that you can go into the military and that doesn't count against you. You can go to a PG if you have the money. So if you're a poor person who can only afford a few hundred dollars of credit and you go to JUCO to get ready to play in NCAA Division I, well, that counts against you. But if you have plenty of money and you go to Hotchkiss or Choate or Deerfield and you PG, that doesn't count. Okay, that's a fairness to note, but that doesn't go to the basic, like, how do we know the balance of this market and the anti-competitive effect? So the anti-competitive effect, Your Honor, is very simple. Well, let's first get the balance. I'm still trying to find out what the market is. So let's talk about the market of NCAA Division I players. Which you said is a monopsony, right? That is a monopsony. Where's the market data in the report for that, or do I just take what Dr. Maxey said? You don't have to take what Dr. Maxey said. You have Coach Shiano, who is a person who actually spends this money. He is a person who includes the players. Oh, let me stop you there. So when you say the coach spends the money, are you suggesting that the NCAA school, Rutgers, spends the money? Yes. I thought it was the NIL payors. I looked at the contract at issue. It makes very clear that this is not a pay-to-play contract, that Rutgers did not pay for this. Is the contract wrong? Are there some facts we don't know about? So there's no doubt that Your Honor is right about that, that it was done initially in the wake of Alston with collectives, and Your Honor is also aware of the recent settlement in June in-house, where these players are being paid directly. But I don't mean to – That hasn't started yet, has it? The $20 million that's paying directly, has that started already? Yes. Is that what we're considering? Can I consider that in this case, or am I talking about the NIL, the contract you have in front of us? What are we talking about? I don't think it matters terribly much, Your Honor, because certainly at the time this case was decided, we're talking about NIL collectives. And just to clarify, when I say the coach is spending the money, my point is the coach is recruiting the players. He is making the determinations as to what sort of player do we want and how much are we willing to commit to that person, right? It's not coming from – in that instance, it wasn't coming directly. Now it's coming directly after house. But the point is, who could be more knowledgeable about the relevant market and what the prices are in that market than the person who's actually determining who he wants to be on his team in that market. So the record data that you want us to rely on when we are determining the market power is the coach's testimony. That's number one. But I would also say, first of all, we make an argument that they're collaterally – the NCAA is collaterally stopped from even contesting the market. Now, Judge Bibas in the case, well, that's a tighter market, right? That's the F football bowl series market, right? Which, by the way, didn't even have NILs at that time, did it? That's correct. But that's a distinction – in my view, that's a distinction without a difference for this reason. What was going on in Alston? I think, look, there's a little bit of sort of moving the goalposts here, if you will. What's happening in this case – and they start out with Smith. We know that – and this court made it very clear in Johnson and in Carnes and in Fisher v. Hollingsworth. Of course, when the Supreme Court changes the world in the way Alston changed the world, a decision like Smith that says eligibility rules are not commercial goes by the boards. That's clear. In fact, I think it's interesting. We hear the word student-athlete used, and this court ridiculed the use of that term, student-athlete, as an NCAA invention. Can we come back to relevant market? I think you said let's start with Division I. Yes. What evidence is there in the record that you can point to that proves that the JUCO rule drives down compensation for Division I football players? There certainly is – that certainly is testimony that – and I don't think there's any dispute that Dr. Maxey testified to that effect. But what evidence is in the record that supports that conclusion? So Coach Shiano testified as well. Coach Shiano primarily testified about the irreparable harm to the player. He would lose out $550,000 possibly for this season. That's correct, Your Honor. That was his primary testimony. But he also testified quite clearly, because he's obviously the person who's most knowledgeable about this, as to the more experienced players being players who go to train at places like JUCOs, which is a no-no for the NCAA, or in PG at prep schools, which is fine, right? Those players come in older, more experienced, and more ready to compete. They get more money. It's not the case that – and this is responsive, I think, to your question, Judge Peebles. It's not the case that all this money is distributed evenly. So, okay, you have players that are leaving that are more experienced, but they're being replaced by younger players. Or the data. I beg your pardon? What evidence is in the record? I guess the question is, at the preliminary injunction stage, where what the court is enjoying to do in doing its analysis is to be predictive as to likelihood of success, and he's doing it in an incredibly compressed time frame. They're complaining that we didn't do it quickly enough. Now they're complaining that we didn't spend enough time gathering econometric data to support what they have never contested. And I think the difference between the FBS and Division I, more generally, is a distinction without a difference. The point is that the NCAA agreed to it, and Dr. Flyer, their expert, agreed to it. Your friend, Mr. Collaro, on the other side, cited Delaware State, an opinion I joined and Judge Montgomery Reeves – I authored and Judge Montgomery Reeves joined – about the dangers of jumping to conclusions and hardening marriage determinations with very little evidence, et cetera. You're trying to get us to give the same effect to these district court cases that are out there in Tennessee or wherever, and there's just not a lot backing them up either. This is all a house of cards built on people saying things without a lot to back them up. Shouldn't we be very hesitant about that? The reason I don't think you should be hesitant is that your standard of review on this appeal at this juncture is to determine whether Judge Karashi abused his discretion in making the decision that he made on an expedited record on admittedly less developed facts. All right, I'll grant you its abuse of discretion. And if you don't show a reasonable likelihood of success on the merits, it is an abuse of discretion to grant a PI. There's no doubt about that, Your Honor. When you say reasonable likelihood of success, the question in your mind is, you now have an expert in this field who is very well credentialed. You have two experts in this field. You have Dr. Maxey who says, as the court found in Alston, the relevant market. Now, there it was, FBS players. It's not a very different market. The Division I NCAA conferences that are paying big money, first through collectives. Does Dr. Maxey say this? I hear you telling me that, but does he say that there's not a difference between the Alston market? Does he articulate what you just said? He says that the Alston market is what governs, yes. And he's quite clear about that. Sir, I've reviewed Judge Karashi's opinion, and Judge Karashi is understandably very moved by the harm to your client. And there's a strong reparable injury. But Judge Karashi was not as punctilious about the lack of numbers, of data, of charts, of elasticity, et cetera. And one could have the impression that that strong sympathy for your client might have, you know, overridden or swayed a lack of data showing a likelihood of success, showing a market. And if we concluded that, wouldn't that have been an abuse of discretion? No, because under Riley, I think you're suggesting that perhaps what Judge Karashi did was actually take Riley to heart and say this is overwhelming evidence of reparable harm. I don't need to go on about it. Everybody understands it. And that means you don't need the same level of proof. But to get there, you have to have data in the record and not merely a conclusion. For example, how much do you estimate the JUCO rule depresses compensation for Division I athletes? When you say how much, like by a dollar amount? This is an easy enough thing. Here's my view, Your Honor. Yes, we don't have econometric evidence that we gathered in the less than 30 days we had before spring practice was going to begin. We don't. We have Dr. Maxey saying what he said. They withdrew Dr. Backus as their expert. They had an expert and they withdrew him. Why did they withdraw him? Because he didn't want to be subjected to cross-examination. Okay, he's withdrawn. Then they bring in Dr. Flyer and he agrees on the market. So do we really at the preliminary injunction stage need to do more than that? Well, I mean, the NCAA comes in and they say, look, look at the law of supply and demand. And they claim that it actually, the JUCO rule increases the amount. If the relevant market is Division I players, the JUCO rule increases the amount of compensation to Division I players. That would only be the case if NIL money was distributed evenly throughout the workforce. It is not. That's what Coach Shiano told us. It's what Dr. Maxey told us. Dr. Flyer did not disagree either. In other words, you have someone who is a more experienced, developed player, someone who went to JUCO. Jet Elad is the perfect example. Was at Ohio University in Division I, did not work out for him there. He moves on. He goes into the transfer. May I finish?  He goes into the transfer portal. He has no takers. He then goes to JUCO. He develops. Now he's older. Now he's more developed. And now he is going to command a higher number. So if the question is the only way. My question relates to the NCAA has mentioned the law of supply and demand. And doesn't the law of supply and demand predict that if the NCAA loosens its rules, the size of the labor pool will increase? And the influx of new players will drive down wages for players? What did you say? Drive down wages for players?  Compensation for players. So, yeah, compensation is going to be driven down. Right? You're going to be denied. But think about, just think about this not being an evenly distributed set of dollars. Right? And Judge Karashi specifically asked Dr. Flyer this question. He likened it to the chairs in the jury box. He said they're not all the same. Right? And the players are not all the same. So when you say these new players like Jet Elad are coming in, they're older, they're more experienced, those are the people that they want to keep out. Why? Because they will pay less for the players who do not develop in that way. If Jet Elad had to come to stay at Ohio University, right, and if he remained academically eligible and he could have done that, he never would have been in a position to command what he was in a position to command. Do you have any further questions? Thank you for your presentation. Thank you, Your Honor. Mr. Klara, I think you reserved three minutes. I did, Your Honor. Thank you. Just a few quick points on the key issues here. First, as to estoppel, we don't think estoppel applies. First of all, an issue has to be litigated for estoppel to apply. And in Alston, at page 86, the Supreme Court concluded that market definition was not litigated in that case. Second, in Alston, and this is page 92, the court says, and I quote, whether an antitrust violation exists necessarily depends on a careful analysis of market realities. That was wholly absent here. And if the point of view from the plaintiffs and from Judge Karashi is that the market has changed, there needs to be some analysis of that. And that's particularly so when you have here a student athlete who is on the verge of going to the NFL draft before deciding to come back to school. So another question of substitutability that's not been addressed. On the markets, I think if you have two markets in an antitrust case, you have none. And here there are actually more than two that are potentially in the mix. There's a market that's been claimed for all Division I athletes. If that's so, JUCOs are in. There's a different market that's been alleged for just Division I. If so, junior college students are out. And then there's an altogether third market that Your Honor referred to, which is the market in which other payers, whether it's collectives or others, are deciding who to compensate student athletes. In that market, the payers are entities that there's no evidence in the record of whatsoever. And you don't have, respectfully in this case, any basis to pick one of those markets or the other, or any basis for determining what the current conditions are in that market. Is there any basis for considering also in a possible relevant market Division II and Division III in addition to JUCO? I think so, Your Honor, and that's the thing. In this new world, what you would need to do as a district judge and as an economist is step back, look at all the potential options available to a student athlete, all the potential choices, and then determine which ones are substitutable for which ones. And if you were going to do an analysis of the so-called NIL market, you would need to do an analysis of who's paying, what they're paying, and why. And none of that, literally none of that, is in the record here. And it carries over to other aspects of the analysis, because it also carries over to the issue of harm. The only harms that Judge Karashi found in the record, and this is on page, I believe it's 8 of the opinion, are first, there was a claim that the rules give a recruiting advantage to Division I member schools. Well, that has nothing to do with the plaintiff in this case. At most, that's a claim that JUCOs are at a recruiting disadvantage for students relative to Division I schools. But that's not a harm that's personal, an injury that's personal to the plaintiff. And then there was an assertion, which we heard repeated today, that wages have been depressed. But again, where is the evidence of that? As your honors have rightly pointed out, and as the Seventh Circuit recently acknowledged in Fort Kurian, it's an odd antitrust theory to say that when there's more labor supply, wages would be higher. That's not typically how the analysis works. This was the Seventh Circuit's decision. And here you don't have any evidence on that. Not even Coach Shiano talked about who he's paying, why he's paying certain people more than others. And one coach's explanation of what he's paying to one student isn't market-wide analysis. Thank you. Thank you. We thank both parties for their excellent thinking and argument.